1  DANIEL CORDALIS (CSBA #321722)
Cordalis Law, P.C.
2  2910 Springer Drive
McKinleyville, CA 95519
3  Ph: (303) 717-4618
dcordalislaw@gmail.com
4
GENEVA E.B. THOMPSON (CSBA #315725)
5  Yurok Tribe
190 Klamath Blvd.
6  P.O. BOX 1027
Klamath, CA 95548
7  Ph: (707) 482-1350 | Fax: (707) 482-1377
gthompson@yuroktribe.nsn.us
8  *Admittance to the Northern District of California Pending

9  *Attorneys for Plaintiffs Yurok Tribe and Mr. Myers*

10                  UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF CALIFORNIA
11                  SAN FRANCISCO DIVISION

12  YUROK TRIBE, on its own behalf and on behalf    Case No. 3:20-cv-5891
    of its members, and
13                                                  Related Cases: No. 3:19-cv-04405-WHO
    FRANKIE MYERS, Yurok Tribal Council Vice
14  Chairperson, in his official and individual
    capacities,                                     COMPLAINT FOR DECLARATORY
15                                                  RELIEF
                        Plaintiffs,
16                                                  Administrative Procedure Act and
          v.                                        Religious Freedom Restoration Act Case
17  U.S. BUREAU OF RECLAMATION,
18                      Defendant.
19

20                          INTRODUCTION

21        1.      This case addresses a recent decision by the U.S. Bureau of Reclamation

22  ("Bureau") as a part of its ongoing operation of the Klamath Irrigation Project that substantially

23  impacts the ability of the Yurok Tribe ("Tribe") and its members to participate in the cultural,

24  spiritual, and religious ceremonies they have practiced since time immemorial. This action seeks

25

26  COMPLAINT - 1 -

to require the Bureau to adhere to its 2020 operations plan and immediately provide water releases necessary to conduct the Tribe's Boat Dance, the final part of the Tribe's world renewal ceremony and religious practice held every other year, scheduled for August 30, 2020.

2.     The Bureau's decision, made only eleven days before the Tribe's ceremony, was made without any consultation or coordination with the Yurok Tribe despite months of requests by the Tribe. The Boat Dance, and the ability of Mr. Myers, the Tribe and its Tribal members to freely exercise their religious practices and complete the world renewal ceremony, is dependent on the water releases.

3.     This case presents two claims challenging the Bureau's August 19, 2020 decision to not provide 7,000 acre feet ("AF") of water releases for the Boat Dance in accordance with the Bureau's 2020 annual operations plan ("AOP"). The first claim alleges that the Bureau's decision is arbitrary and capricious under the Administrative Procedures Act ("APA") because the Bureau's 2020 AOP included 7,000 AF of water earmarked specifically for the Tribe's Boat Dance and the Bureau's rationale for its last-minute decision to not provide the water is contradicted by the evidence that was before the agency. That evidence shows that there presently is sufficient available water—33,564 AF as of August 20—to provide the Boat Dance water releases without running afoul of other federal water commitments, including Upper Klamath Lake thresholds and agricultural deliveries. Because the decision contradicts the evidence, the Bureau acted arbitrarily in its decision to not provide the water.

4.     The second claim alleges a violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(a), because the Bureau's decision is a governmental action that substantially burdens the ability of Mr. Myers and Yurok Tribal members to exercise their religious and spiritual practices. Without the supplemental water to support the Boat Dance as

COMPLAINT - 2 -

provided for in the AOP, the world renewal ceremony cannot be completed because the river

location would have unsafe and impassible conditions for a canoe, precluding the ability to hold

the Boat Dance ceremony. The Bureau's decision was not supported by a compelling interest nor

is it the least restrictive means of accomplishing the government's goals and violates RFRA.

5.      This action asks the Court to issue an order precluding the Bureau from deviating

from the AOP and requiring the Bureau to immediately plan, coordinate, and to provide the

water necessary for the Boat Dance to occur on August 30, 2020.

JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

6.      This action is brought under the APA, 5 U.S.C. § 706(2)(A), and RFRA, 42

U.S.C. § 2000bb-1.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362.

7.      Venue is proper in this Court under 28 U.S.C. § 1391(e) because the Yurok Tribe

and Mr. Myers are located in the district and many of the events and consequences of the

defendant's violations of law occurred or will occur in this district.

8.      This case is properly assigned to the San Francisco/Oakland Division under Civil

L.R. 3-2(c) because this case is related to *Yurok Tribe v. Bureau of Reclamation*, 231 F. Supp. 3d

450 (N.D. Cal. 2017) ("*Yurok I")*, and the currently stayed *Yurok Tribe v. Bureau of*

*Reclamation*, 3:19-cv-04405-WHO (N.D. Cal. filed July 31, 2019) ("*Yurok II*"). Both cases were

assigned to the San Francisco/Oakland Division and heard by Judge William H. Orrick, III. The

Yurok Tribe and the Bureau of Reclamation are both parties in this case and the two related

cases. The underlying contention of the Bureau's management of the Klamath Irrigation Project

and its impacts to the Klamath River and the Yurok Tribe, particularly in 2020, are the same

between this case and the two related cases.

COMPLAINT - 3 -

PARTIES

A.     <u>Tribal Member Plaintiff</u>

9.     Frankie Myers is an enrolled member of the Yurok Tribe and currently serves as the Vice Chairperson of the Yurok Tribal Council. Mr. Myers is a religious practitioner and ceremonial leader who participates in the Tribe's biennial world renewal ceremony and Boat Dance.

B.     <u>Yurok Tribe</u>

10.     The Yurok Tribe is a federally recognized Indian tribe whose reservation is located on the lower Klamath River in northern California, spanning from the river's mouth at the Pacific Ocean upriver to the Yurok village of Weitchpec, near where the Boat Dance occurs. With more than 6,400 tribal members, the Yurok Tribe is the largest Indian tribe in California. By filing this action, the Tribe does not waive its sovereign immunity and does not consent to suit as to any claim, demand, offset, or cause of action of the United States, its agencies, officers, agents, or any other person or entity in this or any other court.

11.     Yurok people have always lived on their ancestral territory along the Pacific Coast and inland on the Klamath River. The Spirit People, Woge', made the land for them and the Creator, Ko-won-no-ekc-on Ne-ka-nup-ceo, put them there. Yurok people believe they were placed on the Klamath River to care for it and they have a cultural covenant to protect the river. The Tribe's creation story tells that the river was made to support the Yurok People and as long as they do not take more resources than they need from the river, it would always provide for their livelihood. Today, the Tribe's Constitution imposes this duty on the Yurok government, to protect and "to restore, enhance and manage the tribal fishery, tribal water rights, tribal forest, and all other natural resources" of the Yurok Reservation. Yurok Const., Preamble.

12.     With an understanding of the river's central role in Yurok culture and life, "a strip

COMPLAINT - 4 -

of territory one mile in width on each side of the (Klamath) river" was set aside for the Yurok

people by Executive Order in 1855 as the "Klamath River Reservation." C.J. Kappler, 1 *Indian*

*Affairs Laws and Treaties* 816-17 (1904); *see also Mattz v. Arnett*, 412 U.S. 481, 483 (1973).

That reservation was "ideally selected for the Yuroks," and "[n]o place can be found so well

adapted to these Indians, and to which they themselves are so well adapted." *Mattz,* 412 U.S. at

486, n.6. The federal government created the reservation to ensure the Yurok people could

continue their fishing and river-centric way of life on their ancestral homeland—it was no

accident that the Klamath River was the geographical heart of the 1855 reservation and continues

to be so today. The present-day Yurok Reservation extends for one mile on each side of the

Klamath River in northern California from the mouth at the Pacific Ocean approximately 45

miles upriver to Weitchpec.

13.    The Yurok Reservation was established on the lower Klamath River so the Tribe

could maintain its fishing and river-centric way of life, reserving to the Tribe fishing and water

rights to support that lifestyle and conferring a legal duty on the federal government to protect

those rights. *See Baley v. United States*, 942 F.3d 1312, 1335 (Fed. Cir. 2019); *Klamath Water*

*Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1213 (9th Cir. 1999) (in operating the

Klamath Project, the Bureau and United States "as a trustee for the Tribes, has a responsibility to

protect their rights and resources," and "has a responsibility to divert the water and resources

needed to fulfill the Tribes' rights."); *Parravano v. Masten*, 70 F.3d 539, 541 (9th Cir. 1995). The

Klamath River and its fishery are "not much less necessary to the existence of the [Yurok] than

the atmosphere they breathe[.]" *Blake v. Arnett*, 663 F.2d 906, 909 (9th Cir. 1981) (quoting

*United States v. Winans*, 198 U.S. 371, 381 (1905)). The Tribe has reserved water rights that

include water stored in Upper Klamath Lake and managed by the Bureau to provide instream

flows in the Klamath mainstem. *Baley*, 942 F.3d at 1339 (Yurok has "an implied water right that includes the Klamath River and the flows therein as controlled by the Iron Gate Dam," and has "reserved water rights [that] encompass Klamath Project water.").

14.     Since the beginning of time, Yurok people have lived on the Lower Klamath River in northern California, fishing and basing tribal culture around the river. But since the building of the federal Klamath Irrigation Project in the early 1900s, the Tribe's ability to exercise its fishing and water rights has been severely impacted. The Klamath fishery has been in steady, and recently rapid, decline and a once abundant salmon fishery is now an unreliable means of subsistence and economy, endangering a culture and people reliant on a healthy river. *See Yurok I*; *Yurok II*.

15.     The lower Klamath River is now managed not by natural hydrologic events, but by the Bureau, who schedules and releases water below the Klamath Project and the four mainstem Klamath River dams to, quite literally, keep water in stretches of the Klamath River. Accordingly, the Bureau's operation of the Project through water releases from Iron Gate Dam (the most downriver dam the Bureau operates) is the most important factor with respect to water management in the lower Klamath River and in protecting the Tribe's water rights.

16.     The Bureau's operation of the Klamath Project has had significant negative impacts to the Yurok Tribe. The Yurok Tribe has been and will continue to be irreparably harmed by defendant's disregard of their statutory duties and by the unlawful injuries imposed by Klamath Project operations.

C.     Federal Defendant

17.     Defendant United States Bureau of Reclamation is an agency of the United States Department of the Interior that constructs and operates federal water projects throughout the United States.  The Bureau has primary management authority over the Klamath Project.

18.     As a federal agency, the Bureau has a federal trust responsibility to manage and protect Yurok trust resources and to work with the Tribe on a government-to-government basis when, but not limited to, undertaking activities that have the potential to affect the rights of the Yurok Tribe and its members.

BACKGROUND

I.    YUROK TRIBE AND THE BOAT DANCE

19.     The Boat Dance is a part of the traditional Yurok religious ceremony held to restore and renew the balance of the world.  The ceremony, including the Boat Dance, is held in late summer in even-numbered years and the Boat Dance the second and final part of the world renewal ceremony. This religious ceremony has been practiced on the river since time immemorial.

20.     In the Boat Dance ceremony, Yurok religious practitioners dance in large hand-carved redwood canoes and travel on the Klamath River near Weitchpec, the most upstream community on the Yurok Reservation. To safely conduct the ceremony and its practitioners, it is necessary to have sufficient water in the river to provide predictable currents and a water depth that allows for the canoes to pass over a riffle.

21.     Without sufficient water to safely hold the Boat Dance, the word renewal ceremony cannot be completed.

22.     Because Klamath River flows are tightly restricted by the Bureau and its Klamath Project operations, river flows at the ceremony site in late August must be augmented with additional water releases to ensure safe canoe passage. Knowing this, the Bureau has customarily provided for the water necessary in its AOP, increasing the environmental water account ("EWA," the water released into the Klamath River), to account for the additional necessary flow volume. Consistent with its historical practices, the Bureau made such an accommodation in its

1   2020 AOP, including in the total 407,000 AF volume, "7 [thousand acre-feet] for the Yurok

2   Tribal Boat Dance Ceremony in August."

3       23.     The inclusion of the EWA water for the religious ceremony in even-numbered

4   years was analyzed in the National Environmental Policy Act ("NEPA") review of the Bureau's

5   2019-2024 proposed action. In the Finding of No Significant Impact ("FONSI") for the proposed

6   action, the FONSI relied on the inclusion of Boat Dance flows as support for its conclusion that

7   there will be no significant impact on tribal sacred sites or practices:

8           The Proposed Action is not likely to limit access to, and ceremonial use of, Indian Sacred

9           Sites on Federal lands by Indian religious practitioners or significantly adversely affect

10          the physical integrity of such sacred sites (EO13007 and 512 OM 3).  Flow increases to

11          accommodate the Yurok Tribe's Boat Dance Ceremony are incorporated into the

12          Proposed Action Alternative.  Therefore, the Proposed Action would not inhibit access

13          to, or ceremonial use of, an Indian Sacred Site nor would the Proposed Action Alternative

14          adversely affect the physical integrity of such sacred sites.

15      24.     The Bureau's Manual, NAI P10, "Indian Policy of the Bureau of Reclamation,"

16  includes the process for which the Bureau will uphold its tribal trust responsibility and provides

17  strong support for the Bureau's longstanding practice of providing the Boat Dance flows. The

18  policy directs that the Bureau "will carry out its programs and projects in compliance with the

19  letter and the spirit of laws and policies relating to Indians," and that "Reclamation supports the

20  Department's trust responsibility policy and will discharge, without limitation, the Secretary's

21  Indian trust responsibility with a high degree of skill, care, and loyalty." With regard to tribal

22  culture, the Manual states "Reclamation will manage Federal lands under its jurisdiction to

23  accommodate access to and ceremonial use of Indian sacred sites by Indian religious

24

25

26  COMPLAINT - 8 -

practitioners, and avoid adversely affecting the physical integrity of such sacred sites." And finally, the Bureau "recognizes that certain cultural resources can have special importance to Indian tribes and will seek to work with tribes to avoid adversely affecting cultural resources identified by tribes as important, and to determine appropriate mitigation measures when such effects cannot be avoided."

25.     The Manual makes clear that it is the Bureau's obligation, as the tribes' federal trustee, to support when possible tribal cultural resources and will work with tribes when the Bureau's actions threaten the ability of the tribe to exercise its religious practices. Yet, none of these actions occurred leading up to the Bureau's last-minute decision to not provide Boat Dance flows and the Bureau's decision ignores the government's bedrock trust duties to Indian tribes.

II.     KLAMATH PROJECT OPERATIONS AND THE 2020 WATER YEAR

26.     The Yurok Tribe has been party to ongoing challenges in this Court to the Bureau's operation of the Klamath Project, including *Yurok I,* and the currently stayed *Yurok II*. In March 2020, the parties in *Yurok II* engaged in settlement negotiations that led the Bureau to adopt an interim operations plan to govern Klamath Project operations through September 2022.

27.     In early April 2020, the Bureau set the EWA allocation in the AOP at 407,000 AF, which included 7,000 AF for the Boat Dance, as required by the 2019-2024 Klamath Operations Plan and the Klamath Project's Proposed Action analyzed in the 2019 Biological Opinion and 2019 Environmental Assessment and FONSI. The AOP is the Bureau's Klamath Project management plan which stakeholders rely on to understand the Bureau's annual water obligations and operating plan.

24.     On May 11, following a dry April and citing concerns due to extremely conservative water forecasts, the Bureau began cutting off augmented river flows agreed upon in the interim operations plan. The Bureau also told the Tribe that it intended to violate the AOP

and the 2019 Plan's requirement that 7,000 AF of water be provided for the Yurok Tribe's

ceremonial Boat Dance. The Tribe and commercial fishing plaintiffs' responded by filing a

motion asking the court to lift the stay in *Yurok II* and to issue a temporary restraining order

requiring the Bureau to adhere to the interim operations plan water allocation and also provide

the water for the Boat Dance. *Yurok II*, ECF 909.

25.     On May 29, Judge William H. Orrick, III denied the Tribe's request, citing the

Bureau's need to reevaluate water conditions and change operations during a dry year to protect

Upper Klamath Lake levels in May to support the endangered sucker fish. Because the interim

operations plan had specific May lake level provisions for the fish, Judge Orrick concluded the

Bureau's management was appropriate given the competing needs and difficult water conditions.

In response to the Tribe's argument that the Bureau was using extremely conservative water

forecasts, Judge Orrick's order noted: "Should water conditions improve, the Bureau will remain

under an obligation set forth in the Interim Plan to manage the water appropriately, including

negotiations through FASTA with interested entities." Order at 8, ECF 924.

26.     On June 4, as the Tribe predicted, the Bureau informed the Tribe and other parties

that water conditions were much improved and not as dire as the agency's forecasts projected in

early May. Incredibly, the agency told the Tribe there was almost 73,000 AF of additional water

available and it would coordinate with the Klamath Basin stakeholders the allocation of the

additional water. The Tribe requested: (1) 16,000 AF to fulfill the volume in the interim

operations plan to support the fishery, and (2) a commitment to provide the 7,000 AF of water

for Boat Dance flows, which the Bureau had stopped accounting for. The Bureau did not honor

the Tribe's request and ultimately provided only 8,000 AF of water for river flows and refused to

commit to provide the Boat Dance flows. The Bureau also reinstated the Klamath Irrigation

1 Project's full 2020 allocation of 140,000 AF, which was increased to 147,000 AF during summer

2 as described in the AOP.

3     27.    In June, July, and August, fearing a last-minute decision that would hamstring the

4 ability to complete the world renewal ceremony, the Tribe continued to seek assurances that the

5 Bureau would provide the Boat Dance flows. The Bureau responded each time that it could not

6 commit the flows until closer to the event when water forecasts and Upper Klamath Lake levels

7 were more certain.

8     28.    As the summer progressed, water conditions improved, providing that clarity. The

9 July 30 Flow Accounting and Scheduling Technical Advisory ("FASTA") group—comprised of

10 federal and tribal scientists tasked with Klamath River flow-related technical support—reported

11 that there was **15,712 AF** of water available beyond the Upper Klamath Lake threshold.  Then,

12 the August 13 FASTA update showed nearly **24,000 AF** above the threshold. Now, the August

13 20 FASTA update shows **33,564 AF** is available, well above the threshold, even with the 7,000

14 AF allocated to the Boat Dance. The increased volume is due to inflows into Upper Klamath

15 Lake exceeding the Bureau's ultra-conservative forecasts, the same forecasting problem the

16 Tribe asserted in May and which lead to the curtailment of Klamath River flows during a fish

17 disease outbreak.

18     29.    On August 4, given the improved water forecast and need to plan and prepare for

19 the Boat Dance, Yurok Chairman Joseph James sent the Bureau a letter requesting assurance that

20 the Bureau would provide the Boat Dance flows. The Bureau responded on August 7 indicating

21 that a final determination had not yet been reached and that the Bureau would inform the Tribe

22 of the decision as soon as possible. The Tribe followed up with the Bureau on August 12 seeking

23 an answer, to no avail.

24

25

26 COMPLAINT - 11 -

30.     Finally, on August 19, the Bureau notified the Tribe by phone and a three-sentence email that it was not going to provide the Boat Dance flows because it was concerned with carryover storage, water for the 2021 water year, and meeting other requirements.

CLAIMS FOR RELIEF

1 - APA CLAIM FOR RELIEF

THE BUREAU'S DECISION TO DEVIATE FROM THE AOP AND NOT PROVIDE 7,000 AF FOR THE BOAT DANCE IS ARBITRARY AND CAPRICIOUS BECAUSE THERE IS AVAILABLE WATER TO MEET ALL 2020 BUREAU OBLIGATIONS.

31.     The Administrative Procedures Act ("APA"), 5 U.S.C. § 706, "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Further, the APA establishes a "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5 U.S.C. § 702).

32.     The APA authorizes courts to "review, hold unlawful, and set aside final agency action, findings, and conclusions that are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A); *see Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002).

33.     An agency action is arbitrary and capricious "if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

34.     The Bureau's decision to deviate from the AOP at the final hour and not provide

COMPLAINT - 12 -

the 7,000 AF of water for the Boat Dance ceremony earmarked in the Bureau's AOP is a final agency action subject to judicial review under the APA.

35.     Through the Bureau's AOP, the biological assessment which the National Marine Fisheries Service based its 2019 biological opinion on Klamath Project Operations, and the environment assessment, the Bureau adopted a plan for managing Klamath River flows. In each of those plans, the Bureau committed to provide 7,000 AF for the Boat Dance.

36.     The Bureau's cryptic rationale about the need to meet "other requirements" is arbitrary and capricious because it failed to provide any evidence or data to support that rationale and why it precludes providing the Boat Dance water. The data produced by the FASTA group, which includes federal scientists, shows that there is currently almost 34,000 AF of water available above the threshold necessary to protect endangered sucker fish in Upper Klamath Lake. Even with providing the 7,000 AF, the lake has a buffer of over 26,000 AF to protect the needs of the suckers and provide carryover storage for the 2021 water year.

37.     This decision is arbitrary and capricious because it ran counter to the evidence before the agency showing there is sufficient available water in the Upper Klamath Lake to provide the Boat Dance ceremony water without harming the endangered suckers in the Upper Klamath Lake or impacting agricultural deliveries. There are no other obligations the Bureau is faced with in the 2020 water year that require it to cut the Boat Dance flows nor did the Bureau identify any such obligations.

38.     The Bureau's commitment to provide water for the Boat Dance recognizes the agency's trust responsibility to the Tribe to protect its resources and accommodate the Tribe's religious and cultural rights, a practice the Bureau's Manual requires.

39.     The Bureau reversed its longstanding practice of providing the Boat Dance flows

COMPLAINT - 13 -

without any tribal consultation or action to explain how its decision is consistent with the AOP or

the agency's trust duties to the Tribe.

40.     The Bureau's decision to wait to provide the Tribe its decision while the Tribe

repeatedly requested assurances about the ceremonial water releases was arbitrary and capricious

and a violation of the APA, particularly in light of water conditions that for over a month

unequivocally showed there would be sufficient water for the ceremony.

2 - RFRA CLAIM FOR RELIEF

THE BUREAU'S DECISION SUBSTANTIALLY BURDENS MR MYERS, THE TRIBE'S,
AND YUROK TRIBAL MEMBERS' FREE EXERCISE OF RELIGION BECAUSE THE
RELIGIOUS PRACTICE CANNOT OCCUR DUE TO THE DECISION.

41.     The RFRA provides that governmental activity may not substantially burden a

person's exercise of religion unless the government demonstrates that its action (1) is in

furtherance of a compelling governmental interest; and (2) is the least restrictive means of

furthering that compelling interest. 42 U.S.C. § 2000bb-1(b).

42.     The Bureau's decision places a direct and substantial burden on Mr. Myers and

the Yurok Tribe and its members' ability to exercise their religion because the Boat Dance

cannot occur without the supplemental water flows. If the Boat Dance cannot take place, the

Tribe's world renewal ceremony cannot be completed, leaving unfinished a critical religious

practice that occurs only every two years. The 7,000 AF of water in the AOP is necessary for the

Boat Dance to occur and the Bureau's decision to not provide that water not only substantially

burden's Mr. Myers and the Tribe from exercising its religious practices, it precludes a religious

practice altogether.

43.     The Bureau has not demonstrated it has a compelling interest to base its decision

to withhold the Boat Dance water, only that it must accommodate "other requirements." Nor has

the Bureau demonstrated that not providing the water is the least restrictive means to further that vague, unsupported interest. The data shows that there is available water well beyond that necessary to meet the Boat Dance flows and meet other water obligations this water year.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Declare that the August 19 decision to deviate from the AOP and not provide the 7,000 AF for the Boat Dance is arbitrary, capricious, and in violation of the APA, 5 U.S.C. § 706(2)(A),

B.     Declare that the Bureau's decision not to provide water for the Boat Dance ceremony violates RFRA, 42 U.S.C. § 2000bb-1,

C.     Require the Bureau to comply with the AOP and immediately coordinate the release of water to allow the Boat Dance ceremony to occur on August 30 at the planned time,

D.     Award plaintiff their reasonable fees, expenses, costs, and disbursements, including attorneys' fees associated with this litigation under the Equal Access to Justice Act 28 U.S.C. § 2412; and

E.     Grant plaintiff such further and additional relief as the Court may deem just and proper.

DATED this 21st day of August 2020.

Respectfully submitted,

*/s/ Daniel Cordalis*
Daniel Cordalis (CSBA # 321722)
Cordalis Law, P.C.
2910 Springer Drive
McKinleyville, CA 95519
Ph:  (303) 717-4618
dcordalislaw@gmail.com

COMPLAINT - 15 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Geneva E.B. Thompson (CSBA # 315725)
Yurok Tribe
190 Klamath Blvd.
P.O. BOX 1027
Klamath, CA 95548
Ph: (707) 482-1350 | Fax: (707) 482-1377
gthompson@yuroktribe.nsn.us
*Admittance to the Northern District of California
Pending

*Attorneys for Plaintiffs Yurok Tribe and Mr. Myers*

COMPLAINT - 16 -